**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

VINCENT DEMARTINO,                                    07 CV 1412 (NG)

                              Petitioner,

                                                      <u>OPINION AND ORDER</u>

      - against -

UNITED STATES OF AMERICA,

                              Respondent.
-----------------------------------------------------------------x

**GERSHON, United States District Judge:**

*Pro se* petitioner Vincent DeMartino, a "made member" of the Colombo Organized

Crime Family of La Cosa Nostra (the "Colombo Family" or "the Family"), was tried before a

jury in this district and found guilty of conspiring to murder Joseph Campanella, a "soldier" of

the same Colombo Family, assaulting him with a dangerous weapon, and using a firearm in

connection with the attempted murder.  DeMartino, sentenced to 300 months of incarceration,

now moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed on

him.  For the reasons set forth below, petitioner's application is denied.

## BACKGROUND

 Beginning on April 26, 2004, DeMartino and co-defendant Giovanni Floridia, an

"associate" of the Colombo Family, stood trial for the unsuccessful assassination attempt made

against Campanella.  The Honorable Raymond J. Dearie, now Chief Judge, presided.

**I.      DeMartino's Representation**

      DeMartino initially retained George Santangelo, Esq. to represent him in this case.  By

letter to the court dated September 3, 2003, the government informed the court and petitioner

that it was possible the government would call Santangelo as a fact witness to testify about phone

calls Santangelo received on the night of the attempted assassination from a cellular telephone

the government sought to prove belonged to petitioner. The government argued that, at the very least, Santangelo had a potential conflict of interest, and it requested a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982). The government suggested that such a hearing, coupled with a stipulation on the facts the government sought to establish through Santangelo's testimony, would resolve any problems posed by the potential conflict, and would prevent the potential conflict from ripening into an actual conflict. Defendant and Santangelo refused to consent to any stipulation, offering only that Santangelo would make a proffer *in camera* demonstrating "that the inferences which the government seeks to draw by calling [him] as [a] witness[] are false." Gov't Supp. Opp'n (Docket Entry ("D.E.") 40) Ex. A at 3-4. After a lengthy colloquy, Judge Dearie agreed to consider counsel's proposal. At a subsequent status conference, Judge Dearie rejected Santangelo's proposed procedure, finding that the *in camera* proceeding would be "beside the point" and "would serve no purpose." *Id.* Ex B at 3-4. The judge noted that the choice rested with petitioner—he could agree to a stipulation or retain a new lawyer, since Santangelo would "be disqualified absent some other alternative." *Id.* at 4. Because no stipulation could be agreed upon, Santangelo was disqualified on the basis of an actual conflict of interest.

After Santangelo's disqualification, DeMartino retained James LaRossa, Esq., an experienced defense attorney in the New York area, to represent him at trial. LaRossa had previously represented William Cutolo, Sr., the then-acting underboss of the Colombo Family,[1] in a 1994 racketeering murder conspiracy trial held in the Eastern District of New York before

---

[1] In the 1990s, before the intra-family struggle known as the "Colombo War," Cutolo, Sr. served as a captain, leading a crew that included both Campanella and DeMartino. After the Colombo War, when Alphonse "Allie Boy" Persico became the acting boss, Cutolo, Sr. became the acting underboss.

Judge Eugene Nickerson, *United States v. Cutolo*, No. 93-CR-1230, in which DeMartino was a co-defendant.

On November 14, 2003, when LaRossa first appeared as DeMartino's attorney in this case, the government noted in the presence of petitioner and on the record the fact of LaRossa's prior representation of Cutolo, Sr.  The government stated at the time:

> Mr. LaRossa previously represented in a trial in this Court back in '93 or so William Cutulo [*sic*.] who was a captain in the Colombo Family who disappeared on May 26, 1999, has been presumed dead since then, and so he obviously had a previous relationship with someone who is going to figure in the testimony of some of the cooperating witnesses in this trial.  I don't think there's a conflict as long as Mr. DeMartino understands that any confidence that Mr. LaRossa had in that representation he couldn't share with him and that type of thing but I don't think it is anything that is not waivable.

Gov't App'x at 68 (Transcript of Status Conference (11/13/2003)).  LaRossa stated immediately that DeMartino was prepared for a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), at any time.  The court responded that "it would be prudent given our earlier discussion that [the court] take Mr. DeMartino through the first stage of a *Curcio* hearing." *Id.* at 77.

In a subsequent status conference held on January 9, 2004, the parties and the court again discussed the issue of LaRossa's prior representation of Cutolo, Sr.[2]  Upon the court's inquiry,

---

[2]  More fully, in response to the court's question as to whether "all problems" regarding defendants' counsel were resolved, the government summarized "the *Curcio* waiver issue" as follows:

> That Mr. LaRossa previously represented William Cutolo, who was also a member of the Colombo Family.  There's going to be significant testimony at trial about Mr. Cutolo and just the two points would be that Mr. Demartino obviously has to understand that Mr. La Rossa can't share anything that Mr. Cutolo, or share with any confidence and that to the extent it would be a defense—they feel it would be a good defense—to

LaRossa confirmed that he had discussed the issue with DeMartino who "is aware of it and [has no] problem complying with the *Curcio* hearing." He also noted that:

> in that Cutolo trial . . . and I guess I was considered lead counsel in that case, . . . Mr. DeMartino was good friend in that case. He sat and participated in what was probably three and half months, if my recollection is current, and the jury acquitted the defendants of that case. So the answer is yes, he is aware of it and I don't think he has any problem complying with the *Curcio* hearing.

*Id.* at 80-81. The court again indicated that it would go through the initial stage of the *Curcio* hearing with DeMartino, though the proceeding ended without it. *Id.* at 80-81. The trial court did not hold a formal *Curcio* hearing at any time thereafter.

## II.     Government's Case in Chief

The government's case consisted of two general categories of evidence: evidence establishing both defendants' participation in the assassination attempt against Campanella and evidence demonstrating that one of the motives for the defendants' criminal actions was to maintain or increase their positions in the Colombo Family.

### A.     Evidence as to Defendants' Participation in the Shooting

The evidence, taken in the light most favorable to the government, proved that, on July 16, 2001, Floridia was the driver of the green minivan that approached Campanella as he was

---

> attack the character of Mr. Cutolo—Mr. LaRossa, because of his representation of Mr. Cutolo, would not be able to do that.
>
> Similarly, the Government may play recordings—one or two recordings, I think it is of an individual named Dominic Dianisio [*sic.*] and William Cutolo, Jr., both of whom were also previously represented by Mr. LaRossa and again to the extent they feel it would behoove them to attack their character as part of the defense, neither of them are obviously going to be witnesses, that would—he may be constrained by his prior representation of them. I believe these are waivable matters, but I just want to put them on the record.

Gov't App'x at 79-80.

opening his own car and that DeMartino, the passenger, fired four or five shots with a handgun at him before speeding away from the scene of the incident. In establishing its case, the government presented testimony of the victim himself, Joseph Campanella, who was a cooperating witness, eyewitnesses who were otherwise uninvolved with the government and the case, and law enforcement officers, along with corroborating documentary evidence, including telephone records, recordings, and photographs. Campanella testified that he recognized both defendants as they approached him on the date of the incident. Civilian eyewitnesses and a law enforcement officer corroborated the events of that day, as testified to by Campanella, and further testified as to identifying descriptions of the defendants' appearance and the getaway car. The documentary evidence included numerous telephone records from a cellular phone, established as DeMartino's secret line (the "Scott phone"), which was retrieved from the minivan identified as the getaway car and belonging to Floridia. These records showed that Floridia made several calls from payphones to DeMartino during times and dates that Campanella was present near the eventual scene of the assassination attempt. The records also showed several calls to other Colombo Family members and to several criminal defense attorneys after the shooting.

### B.     Evidence as to Defendants' Motive for the Shooting

The government also introduced evidence of the defendants' motive for engaging in the assassination attempt, pursuant to 18 U.S.C. § 1959.[3] The government began its case with the

---

[3]     Section 1959(a) provides the length of imprisonment applicable to "[w]hoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do . . . ." This "RICO motive" need not be a defendant's sole motive, but must be *a* motivator for a defendant's alleged criminal act.

testimony of Campanella, who explained at length the history, rules, and structure of the Colombo Family.  In addition to elucidating the requirements to become a "made member" of the Family and describing the Family's induction ceremony, Campanella indicated that the Colombo Family is generally comprised of, in decreasing order of prestige and power, a boss, an underboss, a consiglieri, captains, soldiers, and associates.  Campanella described the rules governing the conduct of made members, specifying that made members of the Family are not permitted to kill other made members without permission from Family leadership.  If a made member kills or attempts to kill another made member without permission, the former is "supposed to get killed."  Tr. 573.  Campanella also testified that Family rules bar sleeping with another member's wife, "hitting on other friends of the [F]amily," and disallow made members from "doing nothing that the captain doesn't know about."  Tr. 599.

Campanella's testimony included several facts from which the jury could infer that the Family leaders had approved a request to kill Campanella.  These included:  Campanella's unwillingness to participate in a plan to kill the then-underboss of the Family; the hatred Campanella's superior, John "Jackie" DeRoss, felt for Campanella; a recording in which DeRoss is heard expressing ire about Campanella; and Campanella's pending indictment in 2001, of which other Family members were aware.  Campanella also testified that, as far as he knew, no one in the Colombo Family had investigated his shooting, tried to find out who shot him, or sought revenge against the perpetrator(s), as Family rules would require for an unauthorized assassination attempt.

## C.  Evidence as to Campanella's and DeMartino's Relationship

Campanella testified about the history of his relationship with DeMartino, whom Campanella identified as a "made member" of the Family since 1991 or 1992.  Campanella

stated that he and petitioner were friends growing up and grew closer in the 1980s, when DeMartino was incarcerated and Campanella helped DeMartino's wife obtain money from the Family, and helped her care for the DeMartinos' daughter. Campanella also described a complaint DeMartino lodged against Campanella with the Family leadership in 1993 or 1994, alleging that Campanella had slept with DeMartino's wife while DeMartino was in prison. The Family leadership believed Campanella's representation that there had been no affair, and the matter was dropped. Campanella stated that he spoke to DeMartino only infrequently after that, in part because DeMartino was again incarcerated and then released on parole with orders not to associate with other Colombo Family members.

## III. Defense Case

DeMartino and Floridia conducted a joint defense and called two witnesses, David Clingain and Dorothy Borgese, as part of their case. David Clingain, an Emergency Medical Technician for the New York City Fire Department, testified that he was in the vicinity of the shooting responding to an unrelated 911 call on the date of the assassination attempt made against Campanella. Clingain testified that he observed "a dark colored van . . . [and] a white Mercedes parked by the fire hydrant and there was an olive skinned gentleman in the front of the green van wearing a white tank top." Tr. at 1236-37. He further testified that the olive skinned man was sitting in the driver's seat with a weapon in his hands, but that he did not know "if he was the one who was shooting or not, . . . [but] that was the vehicle that fired the gun—fired the shots." *Id.* Clingain stated that he did not see the victim being shot but that he heard about five shots being fired and saw the vehicle, its driver, and a "silhouette of another person in the vehicle with him." Tr. at 1247. Clingain also testified that his partner, William Ritter, who was standing next to him at the time Clingain observed the shooting, tended to the victim. Both Clingain and

Ritter spoke with the New York City Police Department ("NYPD") after the shooting and eventually were interviewed by the FBI. A few months after the shooting, the FBI asked Clingain to look at a photo line-up, though he could not identify anyone at the time.[4] Tr. at 1242-44.

Defendants also called Dorothy Borgese, an NYPD police officer who was called to the scene of the shooting. Ms. Borgese briefly testified that she requested a lab examination and that, under the details of offense section, she noted that the "complaining victim states he was walking eastbound towards beach when a green minivan with two male white occupants did fire four to five shots hitting him in the left foot and left arm." Tr. at 1475-76. The defense rested after Ms. Borgese's testimony.

## IV. Procedural History

On May 7, 2004, the jury returned a verdict of guilty against both DeMartino and Floridia on all counts. Judge Dearie sentenced petitioner to 300 months of incarceration.[5]

DeMartino retained Diarmuid White, Esq. for his direct appeal to the United States Court of Appeals for the Second Circuit. On appeal, he argued only that the evidence at trial was insufficient to show that he committed the crimes "for the purpose of gaining entrance to or maintaining or increasing [his] position in" a racketeering enterprise, as required by § 1959(a). On November 2, 2005, the Second Circuit affirmed DeMartino's conviction on the ground that § 1959 does not require the government to prove that maintaining or increasing a defendant's position in a RICO enterprise is the defendant's sole or principal motive and that the jury

---

[4] On March 14, 2004, approximately a month prior to the start of trial, the government faxed to defendants a letter informing them that, on April 24, 2002, David Clingain was shown a photographic array that included Floridia but he did not recognize anyone in the array. Gov't. App'x at 100-02.

[5] Petitioner, a recidivist, was subject to a guidelines range of 288 to 330 months.

reasonably could have inferred from the evidence that DeMartino had both a "position-related" and a "non-position-related" motivation for shooting Campanella. *United States v. DeMartino*, 154 F. App'x 220, 221 (2d Cir. 2005).

On April 17, 2006, the United States Supreme Court denied DeMartino's petition for a writ of certiorari. *DeMartino v. United States*, 547 U.S. 1072 (2006).

On March 17, 2007, DeMartino applied to this court for a writ of habeas corpus under 28 U.S.C. § 2255, alleging: (1) constitutionally ineffective assistance of trial counsel; (2) prosecutorial misconduct; and (3) judicial bias. Briefing on petitioner's motion was completed on July 30, 2007. Thereafter, DeMartino continued to file papers with the court, alleging (1) that he had been denied his first choice of counsel when the court disqualified George Santangelo; (2) that Judge Dearie failed to conduct a proper *Curcio* hearing; (3) that the government suborned perjury and failed to fulfill its discovery obligations pursuant to *Brady* and *Giglio*; (4) that Judge Dearie engaged in judicial misconduct; and (5) that prejudicial evidence connecting DeMartino to an uncharged murder was wrongly admitted; and re-alleging his claim—raised on direct appeal—that the evidence of a racketeering motive was insufficient to support his conviction.[6] *See* D.E.s 13, 20, 23, 24, 26, 31, 35, 36, 43, 45, 47, 48.

## DISCUSSION

### A. Ineffective Assistance of Trial Counsel

Although DeMartino did not raise his ineffectiveness claims on direct appeal, he is entitled to raise them here. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Mui v. United*

---

[6] The court liberally construes DeMartino's numerous filings and addresses all of the claims DeMartino asserted in his initial petition and any arguments in his supplemental papers that can be said to relate (even remotely) to his originally-pleaded claims. DeMartino's claim, in a December 2009 supplemental filing, that "new evidence mandates a new trial," *see* D.E. 48, does not provide citation to newly-discovered evidence. Instead, it is simply an elaboration on DeMartino's previously-made arguments regarding his counsel's alleged ineffectiveness.

*States*, No. 07-4963, slip op. at 8-11 (2d Cir. July 30, 2010). To succeed on an ineffective assistance of counsel claim, a petitioner must show that: (1) counsel's performance fell below the objective standards of reasonableness dictated by prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-89, 694 (1984). Under the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). To succeed on the second prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694.

Petitioner asserts multiple grounds in support of his ineffective assistance of counsel claim.

### 1. Conflict of Interest

DeMartino alleges that LaRossa's trial representation was impermissibly conflicted in several ways. In his original petition and his subsequent filings, DeMartino alleges that LaRossa should have been disqualified as counsel because LaRossa had previously represented former Family boss William Cutolo, Sr. at a 1994 trial in which DeMartino was a co-defendant, and because LaRossa had represented Cutolo's son William Cutolo, Jr. for a short period of time. Cutolo, Jr., like his father, was a member of the Colombo Family. At one point, while represented by counsel other than LaRossa, Cutolo, Jr. had cooperated briefly with the government, and some of the consensual recordings made during his cooperation were

introduced at DeMartino's trial. DeMartino also alleges, in a supplemental filing, that LaRossa's prior representation of Dominic Dionisio, who was also heard on a recording at trial, created a conflict. DeMartino argues that (1) these conflicts jeopardized LaRossa's representation at trial; and (2) that reversal is required because the trial court neglected to hold a hearing pursuant to *Curcio* and its progeny ("*Curcio* hearing"), to secure DeMartino's waiver of the conflicts.

It is axiomatic that "a defendant's Sixth Amendment right to the effective assistance of counsel includes the right to be represented by an attorney who is free from conflicts of interest." *United States v. Blount*, 291 F.3d 201, 210 (2d Cir. 2002). "A defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). If "counsel is burdened with an actual, as opposed to a potential, conflict of interest, a 'fairly rigid' presumption of prejudice applies." *United States v. Stantini*, 85 F.3d 9, 15 (2d Cir. 1996). Where a potential conflict is alleged, a petitioner must demonstrate prejudice. *See, e.g.*, *id.* at 15-16.

In the context of multiple representations, "an attorney has an actual … conflict of interest when during the course of the representation, the defendant['s] interests diverge with respect to a material factual or legal issue or to a course of action" *Id.* at 16 (internal ellipsis, quotation, and citation omitted). "A potential conflict of interest exists if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998). "When the trial court knows or reasonably should know of the possibility of a conflict of interest, it has a threshold obligation to determine whether the attorney has an actual conflict, a potential conflict, or no conflict." *Id.* at 153. In

fulfilling this initial inquiry obligation, "the trial court may rely on counsel's representations." *Id.* Absent this initial inquiry, reversal of a defendant's conviction is required and is automatic. *Id.*

If the initial inquiry reveals an actual or potential conflict of interest, "the court has a disqualification/waiver obligation." *Id.* (internal quotation marks omitted). The court must disqualify any attorney whose conflict is so severe that it could not reasonably be waived. "If it is a lesser conflict, the court must conduct a *Curcio* hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation." *Id.* A *Curcio* hearing is comprised of three parts. First, the court must "advise the defendant about potential conflicts"; second, the court "determine[s] whether the defendant understands the risks of those conflicts"; and third, the court must "give the defendant time to digest and contemplate the risks, with the aid of independent counsel if desired." *Id.* at 153 n.4 (citing *Curcio*, 680 F.2d at 888-90). Where a trial court fails to meet its obligations under *Curcio*, "the defendant must still show that the conflict adversely affected his counsel's performance to obtain a reversal of the conviction." *United States v. Velez*, No. 06-CV-3686, 2006 WL 2621077, at *11 (S.D.N.Y. Sept. 13, 2006) (quoting *Blount*, 291 F.3d at 212) (internal quotation marks omitted).

Here, petitioner alleges that LaRossa's prior representation of the Cutolos and Dionisio created an actual conflict—or, failing that, a potential conflict requiring a *Curcio* hearing. As both the government and LaRossa acknowledged at trial, LaRossa was not burdened by an actual conflict, and petitioner does not make a sufficient showing to the contrary. Petitioner provides no support for his assertion that LaRossa served as "house counsel" to the Cutolo family, nor for his claim that LaRossa's past representation of the Cutolos and Dionisio interfered with his representation of petitioner. In short, petitioner has not demonstrated that "some plausible

alternative defense strategy or tactic might have been pursued" had LaRossa not represented the Cutolos and Dionisio in the past.  *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003) (internal quotation and citation omitted).

With regard to any potential conflict, petitioner alleges, and the government does not dispute, that the trial court did not hold a complete *Curcio* hearing.  However, because the court did complete the initial inquiry—in which Judge Dearie asked counsel for both petitioner and the government about the nature of LaRossa's alleged potential conflict and reasonably relied on counsel's representations that petitioner was willing and ready to waive it—petitioner's conviction will be reversed only if he can demonstrate that he was prejudiced by the potential conflict. *Blount*, 291 F.3d at 212.  Petitioner has not made such a showing.  First, with regard to LaRossa's fleeting past representation of Cutolo, Jr., petitioner complains that, in the absence of any conflict, LaRossa would have objected to the admission of the Cutolo, Jr. audio recordings. But LaRossa had no basis to object to their introduction—they were relevant and FBI Agent Pontecorvo's direct testimony laid the foundation for their introduction.  Second, petitioner argues that he was prejudiced by LaRossa's failure to impeach Cutolo, Jr.'s credibility. However, because Cutolo, Jr. was not a witness and none of his recorded statements, made while he was a cooperator, were offered for their truth, LaRossa had no basis to impeach Cutolo Jr. *See* Fed. R. Evid. 806; Gov't App'x (D.E. 6) 104, 109.  Moreover, LaRossa vigorously and effectively cross-examined Agent Pontecorvo about the creation of the audio recording. LaRossa emphasized that Cutolo, Jr. had received significant expenses from the government throughout his cooperation, and the fact of Cutolo, Jr.'s termination as a government cooperator after he gave false statements to the government.

Petitioner similarly fails to demonstrate prejudice as a result of LaRossa's past representation of Cutolo, Sr. Cutolo, Sr., who has been presumed dead since his disappearance in 1999, was not alleged to have played a role in the crimes charged in this case. His name was referenced by Campanella, who during his testimony provided a detailed description of the Colombo Family hierarchy and structure and described Cutolo, Sr. as one of the family's leaders. Cutolo, Sr.'s veracity and credibility were never at issue. LaRossa's cross-examination of Campanella was therefore correctly focused on Campanella's own truthfulness.

Finally, petitioner alleges that LaRossa's prior representation of Dionisio rendered LaRossa ineffective. However, petitioner does not show any prejudice suffered as a result of this potential conflict.

### 2. Juror "Misconduct" and Jury Instructions

Petitioner contends that LaRossa's representation was rendered ineffective by counsel's failure to request that each juror be individually polled and failure to move for a mistrial after it was revealed that one of the jurors overheard pieces of a conversation in a parking garage, including "Chicky" (petitioner's nickname), "Afandor" (the last name of a testifying eyewitness to the shooting) and "binoculars" (which Afandor used), and that the overhearing juror (juror number 5) had discussed what she heard with other jurors. Petitioner also objects to (1) LaRossa's failure to request jury polls after the jury requested an explanation of RICO; and (2) LaRossa's acquiescence to the court's jury charges on witness credibility—particularly the credibility of Joseph Campanella.

With regard to the juror's overhearing fragments of a conversation in a parking garage, the juror immediately informed the court of what she had heard, and of the fact that she had shared her experience with her fellow jurors. With the consent of all parties, Judge Dearie

questioned juror #5 *in camera* and reported to counsel that he was satisfied that the statements she overheard were extremely brief and totally harmless and that the juror's retelling had not tainted the jury. Judge Dearie also made the transcript of the *in camera* questioning available to the government and to defense counsel. As the government argues, LaRossa's reliance on Judge Dearie's determination was not unreasonable, particularly in light of the fleeting nature of the conversation the juror overheard.

DeMartino also alleges in general terms that LaRossa should have objected to the court's instruction on witness credibility. In the absence of more specific argument, the court is at a loss to determine exactly what petitioner's complaint is with regard to the court's instruction. However, the court's own review does not reveal any defect in Judge Dearie's charge on witness credibility and on the interests of cooperating witnesses. The trial court's charge was standard and provided no basis on which LaRossa could have objected.

Finally, petitioner claims that LaRossa should have requested a jury instruction derived from *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002). Such an instruction would advise the jury that, while guilt can be established beyond a reasonable doubt based on only circumstantial evidence, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* at 70 (internal quotation marks and citation omitted). Since the government's case against DeMartino consisted of both circumstantial evidence *and* direct evidence in the form of eyewitness testimony and the testimony of the victim, *Glenn* is clearly inapplicable. Moreover, the principle of *Glenn* is applied, not as a jury instruction, but rather as a standard for determining challenges to convictions under Rule 29 of the Federal Rules of Criminal Procedure, or on appeal. *See, e.g.*,

*United States v. Rodney*, 302 F. Supp. 2d 276, 278-79 (S.D.N.Y. 2004); *United States v. Vargas*, No. 02-CR-1388, 2003 WL 21659359, at *2 (S.D.N.Y. July 14, 2003).

### 3. Trial Counsel's Strategy

Petitioner alleges several grounds for ineffectiveness based on LaRossa's trial strategy, including: LaRossa's failure to call William Ritter as a witness (Ground f); LaRossa's decision not to argue a non-racketeering motive for the attempted assassination (Ground g); LaRossa's "inadequate" cross-examination of Joseph Campanella (Grounds h, j); LaRossa's improper cross-examination of FBI Agent DeStephano (Ground i); LaRossa's failure to introduce "exculpatory" evidence in the form of a lab report finding no gunpowder residue in the van DeMartino and Floridia used for the shooting (Ground k); failure to "argue vehemently against the admittance of … recordings made by [William] Cutolo Jr." (Ground l); LaRossa's decision not to call as witnesses people who, according to petitioner, would have testified to a non-racketeering motive for the crime, *i.e.*, that Campanella had propositioned petitioner's wife while petitioner was incarcerated (Ground m); and LaRossa's failure to object to the introduction of call information for Floridia's mobile phone (Ground n). DeMartino also argues, in a supplemental filing, that LaRossa failed to fully investigate the extent of DeMartino's connection to the Colombo Family, which DeMartino alleges to be minimal. *See* D.E. 45.

The court has reviewed these claims and finds them all to be without merit. In considering claims of ineffective assistance, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [petitioner] must overcome the presumption that, under the circumstances, the challenged action[s] might be considered sound trial strategy." *Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 689); *see also Mui*, No. 07-4963, slip op. at 16.

Petitioner does not show that the challenged aspects of LaRossa's performance, *e.g.*, his decision not to call specific witnesses or to introduce certain pieces of evidence that petitioner labels "exculpatory", were not part of counsel's "sound trial strategy"—a strategy that, although ultimately unsuccessful, was not unreasonable.

For example, it is neither surprising nor unreasonable that LaRossa did not argue a non-racketeering motive for the attempted murder of Campanella. Such an argument, which implicitly acknowledges that DeMartino did attempt to murder Campanella, would have weakened the alternative defense that Campanella and the eyewitness Afandor were not reliable and that DeMartino was not the shooter at all. Petitioner's claim that LaRossa did not adequately investigate likewise is without merit. Ample evidence supported DeMartino's connection to the Colombo Family, including Campanella's testimony, and petitioner offers nothing admissible and exonerating that would have been revealed by further investigation. Petitioner also complains that LaRossa should have introduced the lab tests showing no gunpowder residue in Floridia's van. But this evidence would not likely have altered the result at trial, given the eyewitness testimony that DeMartino had a cloth or towel wrapped around his arm when he shot Campanella.

LaRossa's cross examinations were thorough and effective, leading Judge Dearie to remark on LaRossa's skill as a cross-examiner. That LaRossa did not ask every possible question does not render him ineffective. Finally, LaRossa was not ineffective for failing to challenge the admission of information obtained from a search of Floridia's cell phone. DeMartino had no expectation of privacy in the phone and thus no standing to challenge the admission of fruits of that search. *See Rakas v. Illinois*, 439 U.S. 128, 132-34 (1978) (rejecting so-called "target" theory of Fourth Amendment standing); *Minnesota v. Carter*, 525 U.S. 83, 87-

88 (1998) (discussing Fourth Amendment standing standards); *see also United States v. Padilla*, 508 U.S. 77, 78 (1993) (rejecting co-conspirator exception to Fourth Amendment standing doctrine). In short, LaRossa's representation did not "fall below an objective standard of reasonableness" and cannot be a basis for the relief DeMartino seeks.

### B. Prosecutorial Misconduct and Judicial Bias

DeMartino did not raise his prosecutorial misconduct or judicial bias claims on direct appeal. In his petition, he states that he was unable to do so because his counsel was "ineffective beyond belief"[7] but that his claim "fully meets the requirements under the laws of the land as ineffective assistance of counsel." Pet. at 5. However, petitioner's conclusory argument is insufficient to demonstrate cause for his failure to raise his claims on direct appeal. Therefore, petitioner is barred from asserting them in the instant motion.

Even if petitioner's claims were not procedurally barred, neither the claim of prosecutorial misconduct nor that of judicial bias has merit. Petitioner alleges that Judge Dearie expressed bias by disqualifying DeMartino's first choice of counsel because of an actual conflict. As discussed below, the disqualification of Santangelo was entirely proper. Petitioner further alleges that several of Judge Dearie's decisions before and during trial—*e.g.*, the judge's decision to retain the overhearing juror, and the judge's allowance of the Cutolo, Jr. tapes without "a proper foundation"—were either incorrect or an abuse of discretion and demonstrate bias. This court disagrees. "Generally, claims of judicial bias must be based on extrajudicial matters, and adverse rulings, without more, will rarely suffice to provide a reasonable basis for questioning a judge's impartiality." *Chen v. Chen Qualified Settlement Fund*, 552 F.3d 218, 227

---

[7] DeMartino does not specify whether his allegation about counsel's ineffectiveness is directed at his trial counsel or at his appellate counsel. Nowhere else in his petition does DeMartino allege ineffectiveness of appellate counsel.

(2d Cir. 2009); *see also LoCascio v. United States*, 473 F.3d 493, 495-96 (2d Cir. 2007). DeMartino offers no support for his judicial bias claim other than his disagreement with Judge Dearie's rulings. Therefore, petitioner's allegation of judicial bias does not warrant habeas relief.

Petitioner's claims of prosecutorial misconduct do not fare better. Petitioner alleges that the government, in refraining from seeking to disqualify LaRossa for the reasons described below, showed "an unspoken and unproffered motivation to retain" LaRossa in place of Santangelo. *See* D.E. 43 at 32. Petitioner offers no basis whatever for this accusation. Additionally, petitioner claims that the government suborned perjury in its direct examination of FBI Special Agent James DeStefano. Petitioner alleges that the government elicited a false statement from the Agent regarding Campanella's identification of DeMartino as the shooter. The trial transcript does not support petitioner's claim. The government elicited Campanella's prior inconsistent statement (in which he said he had not seen who shot him) from the Agent during his direct examination, and the Agent testified about Campanella's subsequent identification of DeMartino as the shooter.

Petitioner also alleges that the government permitted Agent DeStefano to testify falsely about petitioner's motive or intent for the shooting. This claim, too, is without merit. At trial, Agent DeStefano never offered his opinion on DeMartino's motive or intent. Instead, he reviewed phone records and testified about phone calls made from the Scott phone in the week before and day of the shooting, about surveillance of DeMartino's and others' homes, and about a search warrant of Floridia's green minivan. Moreover, in support of his assertion petitioner cites only a 2002 wiretap affidavit in which Agent DeStefano stated that petitioner was seeking permission from higher-ups in the mafia Family to "finish off the job" with Campanella and/or

"attempting to justify" his participation in the first assassination attempt. DeStefano's opinions in the affidavit do not compel the conclusion that petitioner did not have the requisite intent at the time of the shooting, given that a RICO motive need not be a defendant's *sole* motivation for committing a crime—it only need be *a* motivation.

Finally, petitioner alleges that the government did not fulfill its production obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Giglio*, 405 U.S. 150 (1972). *See* D.E. 143 at 15. Specifically, petitioner complains that the government should have turned over a 2002 letter filed in connection with the case *United States v. Joseph Petillo*, 01-CR-056, from Assistant United States Attorney Amy Walsh to Judge Reena Raggi. In the letter, the government discloses that a cooperating witness, whom DeMartino states was William Cutolo, Jr., had "deteriorate[d] significantly" as a witness. *See* D.E. 13 Ex. 5. Because Cutolo, Jr. was neither a witness nor an out-of-court co-conspirator declarant at DeMartino's trial, his credibility was not at issue and the government had no duty to turn over this letter with its *Brady* or *Giglio* disclosures. *Compare United States v. Jackson*, 345 F.3d 59, 70-71 (2d Cir. 2003).

Thus, even absent procedural bar, petitioner's judicial bias and prosecutorial misconduct claims are without merit and provide no basis for habeas relief.

## C. Other Claims

### 1. Disqualification of Santangelo

DeMartino alleges that the trial court's disqualification of George Santangelo—petitioner's first choice of counsel—violated his Sixth Amendment right to counsel of his choosing. Because DeMartino did not raise this argument to the Second Circuit in his direct appeal, it is procedurally barred. *See Bousley v. United States*, 523 U.S. 614, 621-23 (1998). Petitioner does not demonstrate cause for failing to raise the issue on appeal or any resultant

prejudice. Nor does he allege that he is actually innocent. Thus, petitioner cannot overcome the procedural bar.

In any event, petitioner's claim is without merit. While a criminal defendant does have a right to his choice of counsel, "the right to choose one's own counsel" is not absolute. *Wheat v. United States*, 486 U.S. 153, 159 (1988). A criminal defendant cannot choose to be represented by counsel who is burdened by an actual conflict of interest because counsel is an unsworn witness or who may become a testifying witness in the case. *United States v. Locascio*, 6 F.3d 924, 933-34 (2d Cir. 1993). Here, Santangelo was inescapably conflicted in light of the government's decision to call him as a witness at DeMartino's trial to testify about the phone calls made to him from the "Scott" cellular telephone on the night of the attempted murder, and in light of the defense's refusal to stipulate to the facts the government sought to establish through Santangelo's testimony.[8] The trial court attempted to work with the parties to solve what it called "a real problem", exploring "a number of options" with the parties. *See* Govt's Resp. to Pet. Supp (D.E. 40) Ex. B (Tr. 9/6/2003 Status Conference) at 3-4, 6-7. However, when the parties could not agree on any of the options put forth by the court, the trial court was constrained to disqualify Santangelo.[9]

## 2. Racketeering Motive

---

[8] Ultimately, the government did call Santangelo to testify. *See* Tr. 1202-21. Santangelo testified, *inter alia*, that he had no recollection of any phone call from DeMartino on the night of the shooting.

[9] DeMartino suggests in his papers that, because Santangelo was disqualified on the basis of an actual conflict, LaRossa too should have been disqualified, since LaRossa's phone number also appeared on the call log from the night of the shooting for the Scott phone. However, there is a key difference between the two attorneys: DeMartino, using the Scott phone and then later his home phone, got through to Santangelo on the night of the shooting; his calls to LaRossa went unanswered. *See* Gov't App'x at 67 (Tr. (Nov. 13, 2003) at 4). As a result, LaRossa would not be called to testify against DeMartino, and would not be burdened by the same conflict as Santangelo.

Petitioner claims that the evidence provided at trial was insufficient to prove a racketeering motive for the attempted murder. Petitioner argued this claim on direct appeal to the Court of Appeals for the Second Circuit, which rejected it, holding that, based on the evidence presented at trial, the "jury could have inferred that DeMartino had both a 'position related motivation' and a non-position-related motivation for the shooting." *See United States v. DeMartino*, 154 F. App'x 220, 221 (2d Cir. 2005). Because petitioner "already has had a fair opportunity to present his federal claims to a federal forum", *United States v. Frady*, 456 U.S. 152, 164 (1982), and there has been "no intervening change in the law entitling [petitioner] to revisit issues already fully litigated," *United States v. Sanin*, 252 F.3d 79, 85 (2d Cir. 2001) (internal quotation and citation omitted), the claim is procedurally barred, and this court cannot consider it. *See Mui*, No. 07-4963, slip op. at 7.

### 3. Evidence Regarding Murder of William Cutolo, Sr.

Petitioner argues for the first time in one of his supplemental filings that the government prejudiced him by introducing evidence and arguing to the jury that petitioner was involved in the disappearance and presumed murder of William Cutolo, Sr. *See* D.E. 31. Because this claim was never presented on direct appeal, though it could have been, this court is barred from reviewing it. However, the court notes that petitioner provides neither citations to the record nor any other evidence to support his allegation.

**CONCLUSION**

For the reasons stated above, DeMartino's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 is DENIED.  Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  28 U.S.C. § 2253.

**SO ORDERED.**

_____/s/ *Nina Gershon*_____
**NINA GERSHON**
**United States District Judge**

Dated: August 2, 2010
      Brooklyn, New York